

**FILED**

Jul 16 2020

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ___ s/ soniad ___ DEPUTY

ANTHONY JOHNSON
1728 Griffith Ave.
Las Vegas, NV 89104
Telephone: (619) 246-6549

PRO SE

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY JOHNSON, an individual,<br><br>*Plaintiff,*<br>v.<br><br>DAVID KINNEY, an individual;<br>RICHARD TURNER, an individual;<br>MANUEL ALTAMIRANO, an individual;<br>DAVID HUFFMAN, an individual; and<br>DAVID SMILJKOVICH, an individual;<br>PAUL TYRELL, an individual;<br>SEAN SULLIVAN, an individual; and<br>STORIX INC., a California corporation;<br>JUDGE MARILYN HUFF, an individual;<br>JUDGE RANDA TRAPP, an individual;<br>JUDGE KEVIN ENRIGHT, an individual;<br>JUDGE KATHERINE BACAL, an<br>  individual,<br>*Defendants.* | Case No.: **'20 CV 1354 CAB MSB**<br><br>**VERIFIED COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

//
//
//

1

**JURISDICTION AND VENUE**

1.    Plaintiff Anthony Johnson ("Johnson") claims federal jurisdiction pursuant to article III § 2 which extends the jurisdiction to cases arising under the U.S. Constitution.

2.    This Court has jurisdiction over Johnson's claims against Judge Marilyn Huff ("Judge Huff") pursuant to Title 28 U.S. Code § 1331 for claims arising from violations of federal constitutional rights guaranteed by the First and Fifth amendments to the U.S. Constitution and redressable pursuant to *Bivens v. Six Unknown Narcotics Agents*, 403 U.S. 388 (1971).

3.    This Court has jurisdiction over Johnson's claims against all defendants pursuant to Title 42 U.S. Code §§ 1983, 1985(b) and 1986 for violations of protections guaranteed by the First, Fifth, and Fourteenth Amendments of the federal Constitution by defendants under color of state law.

4.    This Court has jurisdiction over Johnson's claims against defendant Storix Inc. ("Storix") on the basis of diversity because Johnson resides in a different State than Storix and because Johnson seeks damages in excess of $75,000.

5.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c).

**PARTIES**

6.    Plaintiff Anthony Johnson ("Johnson") is a natural person who is a citizen of Las Vegas, Nevada residing in Clark County.

7.    Defendant Judge Marilyn Huff ("Judge Huff") is a judge presiding in the U.S. Court for the Southern District of California and a resident of San Diego County.

8.    Defendants Randa Trapp ("Judge Trapp"), Kevin Enright ("Judge Enright") and Katherine Bacal ("Judge Bacal") are judges presiding at the Superior Court of California and residents of San Diego County.

9.    Defendant Storix is a close corporation organized and existing under the laws of the State of California in 2003, with its principal place of business in San Diego County.

//

//

10.    Defendant David Kinney is a citizen of the State of Minnesota and resident of Ramsey County and was at times mentioned herein a citizen of the State of California and resident of San Diego County.

11.    Defendants David Huffman, Richard Turner, Manuel Altamirano, David Kinney, and David Smiljkovich are citizens of the State of California and residents of San Diego County.

12.    Defendants Paul Tyrell and Sean Sullivan are attorneys with the firm of Procopio, Cory, Hargreaves, Savitch, LLP ("Procopio") and citizens of the State of California and resident of San Diego county.

## STATEMENT OF THE CASE

13.    Johnson incorporated Storix in 2003 to market and sell the software ("SBAdmin") he designed, developed, and registered in his name with the Copyright Office in 1999. Johnson was Storix's sole shareholder, officer and director until 2011.

14.    In 2011, Johnson announced that he'd been diagnosed with cancer and given about a 2-year life expectancy. Johnson gifted 60% of Storix to his long-term employees, David Huffman, Richard Turner, Manuel Altamirano and David Kinney, who thereafter maintained a majority of Storix's board and all officer positions (hereafter, collectively "Management").

15.    Storix represented to Johnson that all profits earned when he was the company's sole shareholder had been distributed to him. However, while Johnson was on medical leave in 2012, Management changed Storix's accounting method, amended its 2011 tax records, and thereafter instructed Procopio to bring legal actions against Johnson to deny him access to financial records that might have raised his suspicion and afforded him a reasonable opportunity to investigate whether all profits were properly distributed to him.

16.    In 2013, Johnson unexpectedly returned to Storix with a clean bill of health to improve the SBAdmin software that had been neglected by Management in his absence. Management unreasonably criticized Johnson's work and otherwise antagonized Johnson until he resigned in 2014.

17.    Johnson threatened to withdraw Storix's license to sell SBAdmin if Management would not allow him a position at Storix in which he could protect the integrity of his software without their interference. Procopio sent a letter threatening Johnson with securities fraud for allegedly forcing Management to buy their stock to keep their jobs without informing them that Johnson owned the copyrights to SBAdmin.

18.    In October 2014, Johnson filed a copyright infringement lawsuit against Storix (Case No. 3:14-cv-1873, "Copyright Suit") hoping to encourage Management to compromise. Storix filed a counter-complaint demanding a declaration of ownership of Johnson's copyrights to SBAdmin. The case was assigned to Judge Huff.

19.    Johnson brought a motion for summary judgment and summary adjudication in the Copyright Suit because Storix possessed no clear and unambiguous written agreement required by the Copyright Act to transfer ownership of SBAdmin. Judge Huff denied the motion, finding that a jury should decide if the words "transferred all assets" in Storix's 2003 Annual Report that Johnson signed as Storix's president constituted a transfer of his copyrights.

20.    In February 2015, Johnson used his remaining 40% of stock in Storix to elect himself to the board of directors. In June, Johnson sold his San Diego home due to the cost of the Copyright Suit and moved to Florida where he purchased another home at less than half the price.

21.    In August 2015, Storix filed a direct lawsuit against Johnson in California Superior Court alleging that he breached a fiduciary duty to Storix by intending to operate a competing business while serving as a director. (Case No. 37-2015-00028262-CU-BT-CTL, "Direct Suit".) The complaint falsely alleged that Johnson resided in California when they filed the Direct Suit and relevant events therein occurred.

22.    In December 2015, a jury in the Copyright Suit returned a verdict that the 2003 Annual Report constituted a transfer of ownership of Johnson's registered copyrights to Storix, the first time a jury was tasked with the decision, and the first copyright ownership absent a written agreement. The jury also decided that Storix owned all subsequent versions

1  of SBAdmin because Johnson was a work for hire while he was Storix's sole shareholder,

2  officer and director, another unprecedented decision.

3      23.    In August 2016, Judge Huff awarded Storix $543,704 in attorney fees based on

4  an email Johnson sent Management and some of his customers in 2015 ("*2015 Email*"),

5  deciding it was an attempt by Johnson to destroy Storix despite the email having nothing

6  to do with the copyright litigation. She then denied Storix's motion for an injunction based

7  on the same email, finding that Management was unable to cite any harm even a year after

8  it was sent. Judge Huff granted Johnson's motion to stay execution of the judgement

9  pending appeal only if he posted a supersedeas bond for the full judgment amount. She

10  knew Johnson would have to sell his Florida home to afford it. Johnson has since been

11  living with family in Las Vegas.

12      24.    The Ninth Circuit affirmed the copyright ownership transfer by reciting cases

13  involving oral contracts providing non-exclusive copyright licenses. Neither Judge Huff

14  nor the Ninth Circuit addressed Johnson's argument that the Copyright Office and all case

15  law requires a clear written agreement to transfer copyright ownership. However, the Ninth

16  Circuit reversed the attorney's fee award as unreasonable and remanded to Judge Huff for

17  reconsideration.

18      25.    On remand, Judge Huff would not acknowledge the Derivative Suit showing

19  Johnson was trying to save, not destroy Storix, the $3,739 judgment on the 2015 Email

20  from which she based the attorney fee award, or Procopio's conflict of interest in defending

21  against their client's own derivative claims when simply reducing the fee award to

22  $407,778 to comply with the Ninth Circuit mandate to reduce the fees. Judge Huff also

23  added three years of interest not previously awarded. Her order states that the fees were

24  necessary to deter Johnson from threatening litigation and sending emails she found

25  inappropriate. The copyright attorney's fee award remains about 4 times larger than any

26  other against an individual in a copyright case in history.

27      26.    Without reference to Johnson's brief arguing the contrary, the Ninth Circuit

28  affirmed the fee award on the sole ground that Johnson improperly appealed Judge Huff's

1    decision to award fees rather than the amount of fees remanded for reconsideration. The

2    Ninth Circuit thereby did not decide if Judge Huff complied with the mandate to reduce

3    the fees to a reasonable amount or violated Johnson's constitutional rights.

4        27.    In October 2015, Johnson and another shareholder, Robin Sassi ("Sassi"), filed

5    a shareholder derivative lawsuit in California Superior Court against Management, which

6    was assigned to Judge Joel Wohlfeil. (Case No. 37-2015-00034545-CU-BT-CTL,

7    "Derivative Suit".) The complaint alleged various causes of actions pertaining to majority

8    abuse, including that Storix was harmed by Management filing the Direct Suit against

9    Johnson without board approval. The case was filed by an attorney since Johnson couldn't

10   represent a corporation, and Johnson funded the lawsuit on Storix's behalf. Management

11   self-approved having their personal attorneys send their bills to Storix to payment, then

12   demanded Johnson post a $50,000 shareholder plaintiff's bond to secure his standing as a

13   derivative plaintiff. Johnson voluntarily paid the bond.

14       28.    Procopio interfered and obstructed the Derivative Suit by opposing Johnson's

15   and Sassi's requests for inspection of company records even though they were directors.

16   Such acts included filing a fraudulent restraining order against Johnson in criminal court

17   falsely alleging he was stalking and threatening the lives of Storix's employees, and

18   Johnson proved he had been living in Florida for over a year. The court dismissed the

19   restraining order with prejudice in its entirety.

20       29.    Storix continued to insist that neither Johnson nor Sassi could have access to

21   any of its records because there was a claim against Johnson for competing and that Sassi

22   was helping him. After Judge Ronald Praeger was assigned as a discovery referee in the

23   Derivative Suit, Sassi filed a motion to allow only herself to inspect Storix's financial

24   records. Judge Praeger decided all Sassi's evidence of Procopio interfering and obstructing

25   the Derivative Suit was improperly attached to a reply brief and based his decision instead

26   on Judge Huff's fee order which was itself based on the *2015 Email* that had never been

27   litigated. Although Sassi's motion had nothing to do with Johnson, Judge Praeger's

28   recommendation began by saying. "Anthony Johnson (Johnson) founds Storix, gives up

control, returns, and tries to destroy Storix" and ended by saying Sassi was "colluding" with him. Judge Wohlfeil accepted the recommendation but noted "the Court's intention is not to deem Judge Prager's background or discussion to be dispositive of ultimate factual determinations which the trier of fact is responsible for."

30.    Johnson brought a demurrer to the Direct Suit, arguing that allegations of his "intending" to compete did not constitute a cause of action and the lawsuit must nonetheless have been brought in a shareholder derivative action. Judge Trapp overruled the demurrer, finding the complaint didn't say it was *not* a derivative lawsuit. Judge Trapp denied Johnson's concurrent motion to strike the false allegation of his California residency on the ground that the summons served to his home in Florida was extrinsic evidence. Johnson tried to cite the rule allowing judicially noticed documents to serve as evidence on a motion to strike, but Judge Trapp cut him off by saying, "Arguments are over."

31.    Johnson filed for a writ of mandamus with Judge Trapp to compel Storix to allow all directors the same inspection rights, alleging that Storix was the real plaintiff in the Derivative Suit and that allowing Procopio to obstruct Storix's shareholder claims imposed unnecessary discovery on the company. Judge Trapp denied the petition based again on Storix's argument that there was a lawsuit against Johnson for competing, the restraining order against Johnson that was dismissed with prejudice and because Johnson sent the *2015 Email* that was never litigated. Judge Trapp allowed Johnson only to request records through Procopio that could not be "used against the company."

32.    In April 2016, Johnson filed a cross-complaint to the Direct Suit ("Cross-Complaint") alleging personal damages from Management as a result of their majority abuse, including their filing the Direct Suit against Johnson without board approval and denying him a job at his own company. Management again had their personal attorneys send all bills to Storix to pay for their defense.

33.    Johnson brought a summary judgment motion to dismiss the Direct Suit against him because the Storix board did not authorize or approve the action. Management quickly held a special board meeting to ratify their unlawful filing of the Direct Suit two years

1  earlier. Judge Wohlfeil denied the motion because Storix disputed whether the ratification
2  was sufficient.

3      34.    The Direct Suit was consolidated under the Derivative Suit four months before
4  trial. The consolidation forced Johnson to pay an attorney to represent him in the Direct
5  Suit and Cross-Complaint in addition to representing Storix in the Derivative Suit.
6  Management demanded and were granted multiple trial continuances until Judge Wohlfeil
7  had a conflict and the cases were transferred to Judge Enright for trial.

8      35.    In January 2018, Judge Enright allowed Procopio to sit with Management as
9  plaintiffs against Johnson at the jury trial, granted Storix's pre-trial motions precluding
10  Johnson from saying he supported Storix or that Storix endorsed the Derivative Suit, and
11  precluded Johnson from presenting evidence of claims affecting other shareholders,
12  thereby removing from the jury trial all but Johnson's claim of being denied employment
13  benefits. Judge Enright allowed Management an "at-will employment" jury instruction
14  only applicable to wrongful termination claims against an employer, who used it as their
15  sole defense against Johnson's remaining cross-claim that he was unfairly deprived a
16  position at Storix by the shareholder majority. Judge Enright refused Johnson's jury
17  instructions that the Direct Suit against Johnson is not valid unless approved or ratified by
18  a disinterested shareholder or board majority, and that a 40% shareholder of a close
19  corporation is entitled to a position if he had a reasonable expectation commensurate with
20  his stock ownership.

21      36.    Storix demanded $1.25 million in damages from Johnson for "unjust
22  enrichment" for operating a competing business, but presented no evidence to support it.
23  Realizing Storix's claim against Johnson was facing defeat, Management added a new
24  claim in closing argument that Storix suffered $3,739.14 in "loss of employee productivity"
25  from Johnson's *2015 Email.* The jury rejected the $1.25 million claim of Johnson
26  competing but awarded Storix $3,739.14 on the *2015 Email* claim.

27      37.    After the jury trial, Johnson brought a motion for directed verdict because the
28  Direct Suit was not approved by a majority of disinterested directors. Judge Enright denied

1    the motion only by refusing to acknowledge that Management was the board majority. Two
2    month later, and minutes before the bench trial on the Derivative Suit, Judge Enright
3    granted Storix's motion to dismiss Johnson as a shareholder plaintiff because he couldn't
4    fairly and adequately represent the interests of the Management *defendant* shareholders
5    because of the *2015 Email* award against him. Since Sassi remained a derivative plaintiff,
6    Judge Enright proceeded with the bench trial proceeded, but ignored Johnson's testimony
7    and evidence and found in favor of Management Defendants on all Storix's claims.

8        38.    Judge Enright denied Storix's request for injunctive relief against Johnson,
9    finding that Judge Trapp's order restricting Johnson's rights to Storix's financial records
10   (based on a dismissed restraining order and the *2015 Email*) and Judge Praeger's discovery
11   order saying that Johnson tried to destroy Storix (based on Judge Huff's order based which
12   was based on the *2015 Email*) still stood, made the injunction superfluous.

13       39.    After the bench trial, Johnson could no longer afford an attorney, so he was
14   self-represented in all proceedings that followed.

15       40.    Johnson filed a motion for new trial based on the surprise introduction of the
16   *2015 Email* claim, because the Direct Suit was never approved by a disinterested board of
17   Storix, and because the Direct Suit must have been brought as a shareholder derivative
18   action. Johnson also argued that the misleading "at will employment" jury instruction
19   defeated his Cross Complaint. Judge Enright denied the motion without responding to
20   Johnson's arguments.

21       41.    Johnson opposed Storix's and Management's separate motions for costs and
22   fees, raising numerous legal arguments including that the $3,739.14 judgment was based
23   on the *2015 Email* Johnson had no chance to dispute, Management incurred no legal
24   expenses, and it was unlawful for Procopio to defend against Storix's own derivative
25   claims. Judge Enright ignored all Johnson's facts and arguments when ordering him to pay
26   $180,000 in costs and fees to all parties in all consolidated actions, including the $50,000
27   bond he posted to secure his standing as a plaintiff in the Derivative Suit.

28

1   42.   Johnson filed an appeal of Judge Enright's judgments and orders in the Direct

2   Suit, most notably the *2015 Email* claim. The appeal is pending. (Case No. D075308.)

3   Johnson could not appeal the decisions in the Derivative Suit because Johnson cannot not

4   represent Storix's interests *pro se.*

5   43.   In 2018, Johnson finally abandoned his attempts to save Storix from

6   Management's abuse and neglect and chose not to reelect himself to the board. This

7   triggered Storix's obligation to pay Johnson for the copyrights to SBAdmin. Johnson sent

8   Storix an invoice for $2.75 million for the value of the copyrights. Procopio responded that

9   Storix would not pay for the copyrights. Storix derived about $12 million of income from

10  the copyrights since Johnson withdrew Storix's license to sell SBAdmin and Johnson pas

11  been paid nothing.

12  44.   In late 2018, Johnson obtained a financial record showing that Management

13  converted his Storix profits to their personal equity accounts when he was on medical leave

14  between 2011-2013. Johnson informed Management of his findings and demanded

15  payment of his undistributed profits but received no response.

16  45.   In early 2019, Johnson filed a new lawsuit in California state court against

17  Management for conversion and malicious prosecution. (Case 37-2020-00002457-CU-BT-

18  CTL, "Conversion Suit".) The case was assigned to Judge Bacal.

19  46.   Management filed a motion demanding Johnson post a $160,000 out-of-state

20  plaintiff's bond and a motion to stay until the bond was furnished. After Management failed

21  to answer the Conversion Suit, Johnson filed a request to enter default. Judge Bacal rejected

22  the request because there was a motion to stay on file. Johnson contacted the court clerk to

23  inform her that a stay motion under C.C.P § 1030(b) was not a responsive pleading and she

24  instructed Johnson to refile the request for default. Johnson did so the next day.

25  47.   Judge Bacal scheduled a status conference to address Management's pending

26  bond motion. Judge Bacal bantered with Management's attorney about their mutual

27  admiration for each other, then turned to inform Johnson that she would be rejecting

28  Johnson's request to enter default because Management filed a demurrer the pay before the

1    conference. Johnson noted that the demurrer was filed 28-days, without a request for an

2    extension, and after his request for default had been pending for three weeks, thus

3    preventing Johnson from amending his complaint before or after Management filed their

4    concurrent anti-SLAPP motion. Judge Bacal said she would grant Management's extension

5    without their request and they were free to file until she responded to the request for default.

6    She denied Johnson's request for default the next day.

7        48.    Judge Bacal also stated that the status conference constituted Johnson's first

8    appearance in the Conversion Suit, so Johnson filed a peremptory challenge within the 15-

9    day deadline. Judge Bacal denied the peremptory challenge as untimely. Johnson scheduled

10   an ex parte to address why it was denied, and she stated only that Johnson was confused as

11   to when the 15-day deadline began.

12       49.    In mid-2019, Johnson voluntarily dismissed the Conversion Suit without

13   prejudice so he could revise and filed his claims in the United Stated District Court for the

14   Southern District of California under diversity jurisdiction. (Case no. 3:19-cv-1185-H-

15   BLM.) The complaint added new claims and included Storix and Procopio as parties. The

16   suit was assigned to Judge Janis Sammartino, but Judge Huff had the case reassigned to

17   her court on the sole basis that Johnson and Storix were parties in the Copyright Suit that

18   terminated in 2015.

19       50.    Johnson filed a motion to reassign the case back to Judge Sammartino or that

20   Judge Huff recuse herself because of her prior refusal to acknowledge Procopio's conflict

21   of interest when awarding them fees in the Copyright case. Such facts cannot be ignored

22   in deciding Johnson's malicious prosecution claim without shedding light on the absurdity

23   of her prior fee ruling.

24       51.    The defendants brought three separate Rule 12(b)(6) motions to dismiss

25   Johnson's claims and anti-SLAPP motions based on the same arguments. After vacating

26   the hearing, Judge Huff raised numerous *sua sponte* arguments in her order dismissing 5

27   of Johnson's 7 claims with prejudice, thereby affording Johnson no opportunity to respond

28   or amend his complaint. Judge Huff ignored all arguments and authority in his opposition

11

1    briefs. She dismissed most claims with prejudice because she found them premature or too
2    speculative, but also found no possibility of amending the complaint to cure the
3    deficiencies.

4        52.    Johnson relied on Judge Huff's and the Ninth Circuit's rulings that the "Storix
5    2003 Annual Report" confirmed Johnson's oral contract to transfer ownership of his
6    copyrights to Storix. Judge Huff dismissed Johnson's breach of contract claim in which he
7    demanded payment for his copyrights under the oral contract, now finding that the
8    Copyright Act "requires that in order for a transfer of ownership in a copyright to be valid,
9    'it must be in writing'", thus "Plaintiff is barred from alleging that he had an *oral contract*
10   with Storix wherein he gave the copyrights to Storix."

11       53.    Johnson stated in his complaint that the *2015 Email* claim was pending appeal,
12   and he directed his malicious prosecution action only to Storix's $1.25 million claim
13   against him for competing that the jury rejected. Johnson suspected Judge Huff would
14   dismiss the claim based on Storix's argument that he didn't prevail on the entire underlying
15   lawsuit due to the *2015 Email* claim, so he moved to stay the malicious prosecution action
16   pending the appeal of the Direct Suit in state court. Judge Huff denied Johnson's motion
17   to stay, dismissed his malicious prosecution action with prejudice, then granted
18   Management's motion to stay Johnson's remaining two claims pending resolution of the
19   <u>same appeal</u> without identifying any identical claims or issues. The stay has been pending
20   over six months without a request for an extension.

21       54.    Johnson argued in his motion for reconsideration that Judge Huff's order (1)
22   contains manifest errors of law; (2) dismisses claims based on arguments not raised by the
23   defendants; and (3) failed to acknowledge arguments and authorities in his opposition.
24   Judge Huff again vacated the hearing and denied reconsideration because "Plaintiff relies
25   on arguments that he either did raise or reasonable could have raised in his oppositions to
26   Defendants' motions." Johnson primarily opposed the *sua sponte* arguments raised in her
27   order.

28

1    55.    Judge Bacal awaited Judge Huff's decision on Management's anti-SLAPP
2    motion in federal court before granting them $12,237 in attorney's fees in the Conversion
3    Suit that Johnson voluntarily dismissed. The ground was that Management would have
4    prevailed on their motion had Johnson not voluntarily dismissed the case first. Echoing
5    Judge Huff's order, Judge Bacal found that Johnson's could not allege favorable
6    termination of the "entire lawsuit" underlying his malicious prosecution claim because he
7    didn't succeed on the *2015 Email* claim. She too accepted Management's irrelevant and
8    misquoted cases and ignored all well-established authority Johnson provided to the
9    contrary.

10    56.    Judge Bacal also awarded Management $2,364 in costs, finding them prevailing
11    parties because Johnson dismissed the case. She denied Johnson's motion to strike or tax
12    costs by ignoring and misapprehending statues and case law contrary to her decisions.
13    Judge Bacal also refused Johnson's request to stay her ruling pending the appeal of the
14    Direct Suit in which Judge Enright ordered Johnson to pay costs to all parties by ignoring
15    and misquoting the same arguments and statutes. Johnson filed an appeal of Judge Bacal's
16    cost and fee awards with the California Court of Appeals on the same grounds (Case No.
17    D077096.) Johnson later filed an application to consolidate the two appeals.

18    57.    On April 10, 2020, Johnson filed a new complaint in California state court
19    alleging common counts, this time against only Storix for failure to provide compensation
20    (for his copyrights) and money had and received (the $475,560 of his retained earnings).
21    (Case No. 37-2020-00019054-CU-MC-CTL, "Common Counts Suit".) The complaint was
22    accepted by the court on May 26.

23    58.    On June 3, Johnson received notice that the filing was rejected because his name
24    appeared on the Vexatious Litigant List. The list showed a different "Anthony Johnson"
25    who filed a case in Los Angeles in 2011. Johnson called the court clerk, who instructed
26    him to file a request to file new litigation by vexatious litigant. Johnson did so the same
27    day, showing he was not the person on the vexatious litigant list.

28

59.    On June 12, Johnson received notice that his request for filing by a vexatious litigant was denied by Judge Trapp. Johnson called Judge Trapp's clerk the same day to find out why the filing was denied and why the case number on the notice didn't appear on the court's register of actions ("docket"). The clerk told Johnson that the case was assigned but voided the same day.

60.    On June 23, Johnson attended an ex parte to address why his filing was denied. Judge Trapp's exhibited clear hostility toward Johnson that increased during almost half an hour she spent looking not for why the filing was rejected, but for a reason to do so. She finally said she found it suspicious that Johnson's complaint showed "Anthony J Johnson" in the caption but he signed it without a middle initial. Because Johnson provided a declaration stating that he never filed a case in Los Angeles, Judge Trapp said she had no choice but to permit the case to be heard.

61.    On June 24, the Common Counts Suit was unvoided and Johnson could see it on the docket for the first time. It showed the case was assigned to Judge Bacal and notice of the case assignment was filed and printed on June 8. Johnson downloaded a copy of the notice and saw it was actually printed on June 16. Because the case was voided on June 8, Johnson never received the notice of case assignment.

62.    Johnson filed a peremptory challenge to Judge Bacal the same day, which she denied as "Untimely 6/25/20." If Johnson had received notice of the case assignment on June 8, his peremptory challenge would have been a day late. Johnson first saw the notice on June 24 and filed his peremptory challenge that same day. Johnson still cannot serve the complaint and summons because the court-stamped copy shows "NOT FILED PER COURT ORDER OF 6/12/20."

63.    Prior to bringing this Complaint, Johnson voluntarily dismissed the Common Counts suit without prejudice.

//

//

//

**FIRST CAUSE OF ACTION**

DEPRIVATION OF CIVIL RIGHTS (42 U.S.C. § 1983; 28 U.S.C. § 1331)

**Against Judges Huff, Trapp, Enright and Bacal**

64.   Johnson re-alleges and incorporates by reference all prior paragraphs as though fully set forth herein.

65.   Defendants acted *ultra vires* beyond their legal jurisdiction when violating Johnson's clearly established constitutional right to due process guaranteed by the Fifth and Fourteenth Amendments in their efforts to chill Johnson's valid exercise of free speech and petitioning guaranteed by the First Amendment. Neither qualified nor sovereign immunity shields defendants from acts committed in their individual capacities.

66.   Defendants knowingly and intentionally violated Johnson's constitutional rights in an objectively unreasonable manner, and no reasonable judge could differ as to the unlawfulness of their actions.

67.   Johnson was harmed by having to defend invalid claims and dismissal of his valid claims resulting in loss of personal finances, his investment in Storix, destruction of his professional reputation, and mental anguish.

**SECOND CAUSE OF ACTION**

CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS (42 U.S.C. § 1985(2))

**Count 1: Against All Defendants**

68.   Johnson re-alleges and incorporates by reference all prior paragraphs as though fully set forth herein.

69.   Defendants used the *2015 Email* against Johnson in clear violation of his First Amendment right to free speech.  Defendants each relied on the orders of other defendants based on the *2015 Email* that was not a valid claim and never litigated.

70.   Defendants knowingly imposed unnecessary bonds and substantial costs and attorney fees on Johnson after intentionally ignoring all arguments, statutes and laws contrary to their consistent findings against Johnson for 6 years, with the intention of preventing Johnson from being able to afford an attorney to represent him on appeal.

71.   Defendants violated Johnson's constitutional rights as part of a conspiracy to impede, hinder, obstruct and defeat Johnson's due course of justice with intent to deny Johnson the equal protection of the laws, and to injure Johnson for lawfully enforcing and attempting to enforce his right to equal protection of the laws.

**Count 2: Against Management Defendants**

72.   Johnson re-alleges and incorporates by reference all prior paragraphs as though fully set forth herein.

73.   Defendants abused their shareholder majority to induce Storix to terminate Johnsons at-will employment maliciously and without justifiable cause despite Johnson being Storix's largest shareholder with a reasonable expectation of a position at Storix. commensurate with his 40% company ownership.

74.   Johnson brought a valid lawsuit in California state court against defendants for their conspiracy to deprive him employment benefits of Storix that defendants afforded only themselves.

75.   Defendants acted and continue to act as part of a further conspiracy to impede, hinder, obstruct and defeat Johnson's due course of justice to lawfully enforce or attempt to enforce his right to equal protection of the laws.

76.   Johnson was injured and continues to be injured by the loss of past and future employment benefits he is legally entitled to.

**THIRD CAUSE OF ACTION**

NEGLECT TO PREVENT CONSPIRACY TO INTERFERE (42 U.S.C.§ 1986)

**Against All Defendants**

77.   Johnson re-alleges and incorporates by reference all prior paragraphs as though fully set forth herein.

78.   Defendants had knowledge of the wrongs conspired to be done or about to be committed, and each had power to prevent or aid in preventing the commission of the wrongful acts but neglected to do so. Any person in the same circumstances with reasonable diligence could have prevented the wrongful acts.

**FOURTH CAUSE OF ACTION**

COMMON COUNTS (California State Law)

**Count 1: Against Storix (Failure to Compensate for Goods Provided)**

79.   Johnson re-alleges and incorporates by reference paragraphs 1 through 63 as though fully set forth herein.

80.   Defendant requested, by words or conduct, that Johnson provide it copyrights to the SBAdmin software. An implied promise existed between Johnson and defendant, wherein defendant derived income from its use of the copyrights in exchange for future payment to Johnson when his participation in Storix terminated.

81.   Johnson provided defendant the copyrights requested, expected and intended that the copyrights benefit defendant, and Johnson expected to be compensated for the copyrights. Defendant was obligated to compensate Johnson for the copyrights when Johnson's participation in Storix terminated. Johnson demanded payment and defendant expressly refused to pay for the copyrights.

82.   Defendant benefitted, and continues to benefit, from its use of the copyrights in such a manner and under such circumstances that the law imposes a duty of compensation to Plaintiff therefor on the basis of *quantum valebant*.

83.   Johnson was harmed by defendant's refusal to compensate him $2.75 million for the reasonable value of his copyrights.

**Count 2: Against Storix (Money Had and Received)**

84.   Johnson re-alleges and incorporates by reference paragraphs 1 through 63 as though fully set forth herein.

85.   Storix's profits earned while Johnson was the company's sole shareholder were Johnson's personal property to which he was fully entitled. Defendant took possession and retained substantial money owed to Johnson and misrepresented and concealed the amount owed to Johnson.

86.   Johnson was unable to reasonably discover the money owed until 2018 because Management directed Storix's attorneys to substantially interfere with his rights to

1    financial records as a major shareholder and company director. Johnson demanded the

2    amount owed and was refused payment.

3        87.    Defendant wrongfully received and is withholding money which rightfully

4    belongs to Johnson. Johnson did not give informed consent or otherwise approve of

5    defendant's retention or use of money owed to him.

6        88.    Johnson was harmed by defendant's unlawful retention of $475,560 owed to

7    him.

8                              **PRAYER FOR RELIEF**

9        89.    Plaintiff demands general and special damages against defendants, jointly or

10    severally, according to proof at trial;

11        90.    For consideration of the fair value of Plaintiff's copyrights;

12        91.    For pre-judgment interest and costs of suit;

13        92.    For an accounting of Storix, Inc's financials records;

14        93.    For punitive damages according to proof at trial;

15        94.    For a declaration:

16            a.    That Judges Huff, Trapp, Enright and Bacal exhibited clear bias against

17                Johnson, violated his constitutional righs, and otherwise treated Johnson

18                unfairly as a *pro se* litigant;

19        95.    For injunctive relief:

20            a.    Under Fed.R.Civ.P. § 60(b), reversal of Judge Huff's order to stay

21                proceedings in Case No. 3:19-cv-1185, reversal of all orders therein

22                dismissing Johnson's claims with prejudice, and for an order transferring the

23                case to either this court or the judge originally assigned to the case, Judge

24                Janis Sammartino.

25        96.    For such other and further relief as the Court may deem proper.

26                              **CERTIFICATION**

27        Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of

28    my knowledge, information, and belief that this complaint: (1) is not being presented for

an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case—related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Dated: July 12, 2020                                By: